## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2019, 6:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kurt A. Young
Nashville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ryann S. Clark,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 31, 2019

Court of Appeals Case No.
18A-CR-1136

Appeal from the Brown Circuit Court

The Honorable Judith A. Stewart, Judge

Trial Court Cause No.
07C01-1702-F3-140

**Pyle, Judge.**

# Statement of the Case

[1] Ryann Clark ("Clark") appeals his conviction, following a jury trial, for Level 3 felony neglect of a dependent resulting in serious bodily injury.[1] He asserts that the State presented insufficient evidence to support his conviction. Concluding that there was sufficient evidence to find Clark guilty beyond a reasonable doubt, we affirm his conviction.

[2] We affirm.

# Issue

Whether there was sufficient evidence to support Clark's conviction.

# Facts

[3] In early July of 2016, TJ was born to Christina Pritchard ("Pritchard") and Clark. Clark voluntarily admitted to paternity and received visitation with TJ every week on his day off from work and again from Saturday morning until Sunday night. By the end of August, the visitation schedule had been adjusted to allow TJ to stay with Clark and his mother, Gidgette Hall ("Hall"), for extended periods of time. This change was intended to allow TJ to spend more time with Hall, who was terminally ill.

---

[1] IND. CODE § 35-46-1-4.

[4] Eight-week old TJ went to stay with Clark at his house for a week, beginning on August 30th. On the morning of September 2nd, Clark "saw this lump . . . the size of [his] pinky . . . on the side of [TJ's] head." (Tr. Vol. 3 at 15). He took TJ to Hall, who "started to freak out." (Tr. Vol. 3 at 15). Hall then called TJ's pediatrician, Dr. Rachel Woods ("Dr. Woods"), to schedule an appointment for later that day.

[5] Clark and Hall accompanied TJ to Dr. Woods' office. Dr. Woods performed an examination and found TJ very fussy. When she examined TJ's head, "there was a squishiness to it," and she saw that "the skull could possibly be fractured." (Tr. Vol. 2 at 60). She also saw "a bruise on his right cheek." (Tr. Vol. 2 at 60). Dr. Woods questioned Clark about the head injury, but Clark initially stated that he did not know what had happened. Dr. Woods asked Clark what happened a second time, and he stated that "TJ was laying on a bed and then perhaps something hit him." (Tr. Vol. 2 at 60).

[6] Dr. Woods referred TJ to Columbus Regional Hospital for an emergency CT scan of his head. The CT scan revealed that TJ suffered from "a right parietal fracture and then a hematoma in the brain." (Tr. Vol. 2 at 62). Following the CT scan, Dr. Woods flagged TJ's case for possible child abuse and contacted the Department of Child Services ("DCS"). DCS initiated an investigation and TJ was transferred to Riley Hospital for Children ("Riley Hospital") for further care.

[7] Pritchard, who met Clark, Hall, and TJ at Columbus Regional, rode in the ambulance with TJ to Riley Hospital. After arriving at Riley, Pritchard called Clark and asked him to explain what had happened to TJ. Clark told her that he had tripped over the dog and dropped TJ onto a mattress.

[8] The Riley Hospital doctors diagnosed TJ with a fractured skull and soft tissue swelling, both of which are indicators of possible trauma in a non-mobile infant. They then ordered TJ to undergo an MRI, which revealed bleeding on the surface of his brain. Based on the nature of the injuries, Riley Hospital social worker, Jennifer Benson ("Social Worker Benson"), was notified. Social Worker Benson completed a full psycho-social assessment of TJ and then spoke with the emergency room physicians and the neurosurgeon. Together, they concluded that TJ's injuries were not consistent with Clark's claim that TJ was dropped on a mattress. They then decided to make another report to DCS to ensure an investigation occurred outside of the hospital.

[9] At approximately 8:00 p.m. on September 2nd, DCS family case manager, Stephanie Clephane ("Case Manager Clephane"), received a call from the child abuse hotline. Thereafter, she requested assistance from the Brown County Sheriff's Office and Deputy Brian Shrader ("Deputy Shrader") was assigned to the case. Clark voluntarily participated in an interview with Case Manager Clephane and Deputy Shrader.

[10] Initially, Clark explained that he had no idea what had happened to TJ. He acknowledged that he was TJ's sole caregiver from August 30th until the time of

the injury. Clark eventually stated that on the night of September 1st, he was walking to put TJ in his bassinet when his dog jumped on him causing him to fall. He explained that he then threw TJ onto the bed, and he landed in a "crevice" between his mattress and the wall of his bedroom. (Tr. Vol. 2 at 106). Clark further explained that he had heard a "thud" after throwing TJ, but TJ did not cry at all. (Tr. Vol. 2 at 101). Clark then checked TJ over and saw no signs of injury. After the interview, Case Manager Clephane conducted a home visit. During this visit, she took photographs of Clark's bedroom and did not find a crevice between the mattress and the wall.

[11] TJ was discharged from Riley Hospital on September 3rd but was readmitted one day later. During the second admission, TJ was seen by Dr. Shannon Thompson ("Dr. Thompson"), a general pediatrician who also specializes in child abuse pediatrics. Dr. Thompson performed a physical examination of TJ and observed that he had bruising on his right temple, his right cheek, his lower right buttock, and small abrasions under his chin. She also reviewed TJ's records from his previous hospital stay. Dr. Thompson noted that, while skull fractures ordinarily cause blood to pool directly underneath the injury, in TJ's case, blood was present elsewhere in his brain. She concluded that TJ experienced some form of trauma and that the injuries were the result of a single impact. Based on her experience, she believed that TJ "was a victim of non-accidental trauma or abuse." (Tr. Vol. 2 at 222).

[12] The State charged Clark with Level 3 felony domestic battery resulting in serious bodily injury to a person less than fourteen years old and Level 3 felony

neglect of a dependent resulting in serious bodily injury. The trial court conducted a three-day jury trial. Dr. Woods, Case Manager Clephane, Deputy Shrader, Pritchard, Social Worker Benson, Dr. Thompson, and TJ's maternal grandmother, Tonya Jackson, testified to the facts above for the State.

[13] Clark testified on his own behalf. He stated that as he was going to put TJ into his bassinet, his dog jumped up, and he tripped over the dog. Clark further explained that as he fell to the ground, his "first reaction" was to toss TJ on the bed. (Tr. Vol. 3 at 19). When Clark got up, he found TJ "in the crevice of – between . . . – the wall and [his] mattress." (Tr. Vol. 3 at 19). On cross-examination, Clark acknowledged that "throwing a 56[-]day old child" would endanger the child. (Tr. Vol. 3 at 28).

[14] Dr. Andre Lloyd ("Dr. Lloyd"), a bio-mechanical engineer with a PhD in pediatric head injuries, also testified on behalf of Clark. Dr. Lloyd reviewed all of TJ's medical records, the police report, and the DCS interview. He testified that he believed TJ's head injury was the result of a "single impact event." (Tr. Vol. 3 at 54). He further explained that he did not believe TJ's injury had occurred the way Clark had stated. Specifically, Dr. Lloyd concluded that the "characteristics tell you that . . . the tossing on the bed wasn't . . . [the] abrupt event." (Tr. Vol. 3 at 54-55).

[15] The jury found Clark guilty of neglect of a dependent, and not guilty of domestic battery. The court then sentenced Clark to ten (10) years in the

Department of Correction, with six (6) years suspended to probation. Clark now appeals.

# Decision

[16] On appeal, Clark challenges the sufficiency of the evidence for his Level 3 felony neglect of a dependent resulting in serious bodily injury conviction. Our standard of review for sufficiency of evidence claims is well-settled. We do not assess the credibility of the witnesses or reweigh the evidence in determining whether the evidence is sufficient. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We consider only the probative evidence and reasonable inferences supporting the verdict. *Id*. Reversal is appropriate only when no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*. The evidence is not required to overcome every reasonable hypothesis of innocence and is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id*. at 147.

[17] Clark does not dispute that he was in a position of care concerning TJ at the time he was injured, nor does he contest the fact the TJ suffered serious bodily injury. Instead, Clark argues that there was insufficient evidence to establish that he knowingly placed TJ in a situation endangering TJ's life or health resulting in serious bodily injury.

[18] To obtain a conviction for neglect of a dependent resulting in serious bodily injury, a Level 3 felony, the State was required to prove beyond a reasonable doubt that Clark had the care of a dependent and knowingly placed the

dependent in a situation endangering the dependent's life or health resulting in serious bodily injury. I.C. § 35-46-1-4. A person engages in conduct knowingly if, "when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b).

> Under the child neglect statute a 'knowing' mens rea requires a subjective awareness of a 'high probability' that a dependent had been placed in a dangerous situation. Because, in most cases, such a finding requires the factfinder to infer the defendant's mental state, this Court must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper.

*Pierson v. State*, 73 N.E.3d 737, 741 (Ind. Ct. App. 2017) (internal citations and quotations omitted), *trans. denied*.

[19] Here, the jury heard evidence that TJ was not injured in the manner described by Clark, specifically that TJ hit his head on a mattress. Three of the State's witnesses explained that, at the least, it was extremely unlikely that TJ's skull fracture resulted from falling on a bed. Additionally, Clark's own witness, Dr. Lloyd, testified that "the tossing on the bed wasn't . . . [the] abrupt event." (Tr. Vol. 3 at 54-55). In addition to the skull fracture, TJ also had significant bruising on his right temple, right cheek, and right buttock. Dr. Thompson believed all of TJ's injuries were the result of a single impact. In further contrast to Clark's explanation for TJ's injuries, Dr. Thompson stated that TJ's injuries were caused by "non-accidental trauma or abuse." (Tr. Vol. 2 at 222). Dr. Woods similarly believed the most likely cause of the injuries was due to "[s]ome sort of trauma." (Tr. Vol. 2 at 62). Importantly, Clark, the only adult

present in the bedroom when TJ sustained his injuries, acknowledged that "throwing a 56[-]day old child" would endanger the child. (Tr. Vol. 3 at 28). Based on all the evidence, the jury could have reasonably inferred that Clark was aware of a high probability that he placed TJ in a dangerous situation by throwing him. *See*, *e.g.*, *Dexter v. State*, 945 N.E.2d 220, 224 (Ind. Ct. App. 2011) (affirming neglect conviction of defendant who, despite being warned not to do so by defendant's mother and child's mother, threw a wet three-year-old child into the air above a bathtub, failed to catch the child, and child sustained fatal head trauma after hitting the tub), *trans. granted*, *summarily aff'd in relevant part*, 959 N.E.2d 235, 237 (Ind. 2012). Accordingly, we hold that the evidence was sufficient to support the jury's determination that Clark knowingly placed TJ in a situation endangering TJ's life or health resulting in serious bodily injury.

[20] Affirmed.

Najam, J., and Crone, J., concur.