FILED

Apr 04 2017, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Cara Schaefer Wieneke
Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joseph Lee Pierson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | April 4, 2017 <br><br> Court of Appeals Case No. <br> 89A05-1306-CR-311 <br><br> Appeal from the Wayne Superior Court <br><br> The Honorable Gregory A. Horn, Judge <br><br> Trial Court Cause No. <br> 89D02-1202-MR-2 |

**Baker, Judge.**

[1] Joseph Pierson appeals his conviction for Neglect of a Dependent Resulting in Death,[1] a Class A Felony. He argues that because he is intellectually disabled[2] he could not have formed the requisite intent to knowingly and voluntarily neglect a dependent; instead, he requests that he be convicted of reckless homicide. Additionally, he argues that the trial court erred by permitting one expert witness to testify via video deposition, and by permitting another expert witness to suggest that the legal definition of "mental disease" or "insanity" requires psychosis or hallucination. We find that there was sufficient evidence from which a jury could find that Pierson acted in a knowing and voluntary manner, that parties in a criminal case are permitted to agree to use a video deposition, and that the full context of the experts' remarks did not mislead the jury of the applicable legal standards; accordingly, we affirm.

---

[1] Ind. Code § 35-46-1-4(a)(1).

[2] We strongly prefer to use the term "intellectual disability" rather than "mental retardation." It is the case, however, that much of our older statutes, case law, and technical language used by expert psychiatrists retain the latter phraseology—fidelity to the record compels us to quote testimony accurately, and so we will use the latter phrase where we have no other choice.

# Facts[3]

[2] Pierson and Amy Hockett had their fourth child, K.H., on October 11, 2011.[4] K.H. weighed roughly eight and one-half pounds at birth, and at his discharge from the hospital weighed just under eight pounds.

[3] On February 5, 2012, the parents called the police because K.H. was not breathing. Emergency responders found Pierson holding K.H. They noted that the baby was extremely skinny, his limbs were stiff, and his skin was pale and cool to the touch. There were urine-soaked diapers around the home, which were also covered in feces. One responder later testified that K.H. had died long before they arrived.

[4] Investigators interviewed the parents, but Hockett did most of the talking. Hockett said that K.H. could not keep food down well and that he suffered from diarrhea. She said that they would feed the baby every three or four hours. She informed investigators that Pierson has the mental functioning of a twelve- to fifteen-year-old.

[5] An autopsy revealed that K.H. was extremely malnourished and that his body had wasted "away to practically nothing." Tr. p. 977. At his death, K.H.

---

[3] We held oral argument on March 14, 2017, at Vincennes University in Vincennes, Indiana. We thank the University and its staff and students for their hospitality, and we thank the parties for their engaging and illuminating oral advocacy.

[4] A pre-sentence investigation report, prepared after Pierson's conviction, indicates that Pierson voluntarily terminated his parental rights to a fifth child. The record does not reveal the circumstances of this termination, nor the reason why Pierson's other children were left in his custody.

weighed six pounds, two ounces, which was two pounds less than when he left the hospital four months earlier. K.H. had bed sores on his lower back, which could have resulted from being left on his back for an extensive period of time or from staying in a soiled, unchanged diaper. The autopsy doctor estimated that K.H.'s level of malnutrition would only be possible after ten to eleven weeks.

[6] On February 15, 2012, the State charged Pierson with murder and neglect of a dependent, a Class A felony.[5] The State later added a separate charge of neglect of a dependent, a Class D felony. Pierson filed a notice that he would argue insanity, based on his intellectual disability. After an evaluation, Pierson was found competent to stand trial.

[7] At his February 4-8 and 11-12, 2013, trial, the State presented evidence that another of Hockett's and Pierson's children, D.P., was hospitalized for low weight in 2009. Hockett and Pierson received instructions on how to prevent such a medical condition in the future. A family friend testified that she had previously scolded Pierson for improperly filling K.H.'s formula bottles. That friend, Hockett's mother, and Hockett's step-father all testified that Hockett repeatedly mentioned taking K.H. to the local hospital for medical treatment for a range of maladies including leukemia, reflux, gallbladder problems, and kidney stones. Representatives from that hospital, however, testified that K.H.

---

[5] Hockett was also charged, and ultimately convicted, of murder. Pierson appealed separately, so Hockett's case is not before us.

had not been brought into the hospital since October 18, 2011, one week after his birth, and that he was perfectly healthy at the time.

[8] Two expert witnesses testified regarding Pierson's low-level mental functioning. They both opined that Pierson had a mild intellectual disability based upon his low I.Q. score and his inability to respond to basic abstract questioning. Pierson's I.Q. score has consistently registered around sixty-seven; the threshold score to be considered intellectually disabled is seventy. Neither expert, however, thought that Pierson met the definition of insanity. One expert, Dr. Parker, said the following: "Well the Indiana definition of mental disease calls for the presence of significantly impaired perception, uh, which I interpret to mean symptoms of psychosis, like hallucinations or delusions . . . ." Tr. p. 1065. Because Pierson did not experience psychosis or hallucinations, Dr. Parker concluded that Pierson did not meet the definition of insane. Pierson did not object to this testimony.

[9] Both experts[6] did agree that Pierson's disability would impose moderate limitations on his capacity to maintain concentration, keep a routine, or carry out the basic activities of daily living. Dr. Parker also testified that someone with Pierson's condition might not even notice his own medical conditions, or that he should seek medical treatment, let alone notice the medical needs of another. Dr. Parker testified that Pierson was unable to calculate eight plus

---

[6] The other expert, Dr. Davidson, testified via prerecorded video deposition, to which Pierson did not object.

five, twelve minus nine, or ten minus four. *Id.* at 1076-77. Pierson *was* able to recall, however, that he should add one scoop of formula for every two ounces of water, two scoops for four ounces of water, and three scoops for six ounces of water. *Id.* at 1098.

[10] The jury found Pierson not guilty of murder. He was found guilty but mentally ill of reckless homicide (a lesser included offense of murder), Class A felony neglect of a dependent resulting in death, and Class D felony neglect of a dependent. Out of double jeopardy concerns, the trial court entered a conviction for Class A felony neglect of a dependent resulting in death and vacated the other convictions. After a sentencing hearing, the trial court sentenced Pierson to thirty-seven years executed. Pierson now appeals.

## Discussion and Decision

[11] Pierson argues that there is insufficient evidence to convict him of neglect of a dependent resulting in death. That crime requires the State to prove, among other things, that the defendant acted "knowingly or intentionally" to place a dependent in a situation that endangers the dependent's life. I.C. § 35-46-1-4(a)(1). He contends that, because of his intellectual disability, the State did not prove that he acted with the requisite intent; accordingly, he asks that he be convicted of reckless homicide instead. He also argues that the trial court committed reversible error by allowing Dr. Davidson to testify via video deposition, which foreclosed the jury's ability to ask him questions. Finally, he

argues that the trial court erred by allowing Dr. Parker to suggest that a person can only be found insane if suffering from psychosis or hallucinations.

# I. Sufficiency of the Evidence

Pierson acknowledges that "[l]ow mental capacity is not a defense to a criminal charge." *Hester v. State,* 512 N.E.2d 1110 (Ind. 1987). But he notes that neglect of a dependent is somewhat unique in that it applies not only to affirmative actions, but failures to act as well. Pierson can only be convicted if he is shown to have acted or omitted to act "voluntarily," Ind. Code § 35-41-2-1(a), and he asks rhetorically, "If Pierson's mild mental retardation prevented him from maintaining the standard of care of a 'reasonable parent,' then how could his failure to act as a reasonable parent be voluntary?" Appellant's Br. p. 16. Pierson distinguishes *Smith v. State*, 408 N.E.2d 614, 619 (Ind. Ct. App. 1980), in which we affirmed a trial court's refusal to allow the defendant to present evidence that "her personality was meek, timid, and dependent" in an attempt to argue that she could not be guilty of neglect of a dependent. Pierson argues that his mental incapacity is tied directly to whether he would be capable of properly caring for a dependent.

Pierson also emphasizes the expert testimony that a person with his condition would be susceptible to manipulation and implanted memories. He notes the behavior of Hockett, who spun a complex set of lies and stories regarding the medical care that K.H. was receiving. Pierson argues that a person with his condition cannot be said to have "voluntarily" neglected to care for K.H. when

Hockett was lying to him, making him believe that the child was receiving proper and adequate care.

[14] Our standard of review compels us to affirm Pierson's conviction unless no reasonable fact-finder could find the elements proven beyond a reasonable doubt. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). "Under the child neglect statute a 'knowing' mens rea requires a subjective awareness of a 'high probability' that a dependent had been placed in a dangerous situation." *Villagrana v. State*, 954 N.E.2d 466, 468 (Ind. Ct. App. 2011). "Because, in most cases, such a finding requires the factfinder to infer the defendant's mental state, this Court must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper." *Id.*

[15] We find that the State presented sufficient evidence to prove that Pierson's actions were voluntary and knowing. K.H. was Pierson's fourth child with Hockett. Several witnesses testified that Pierson was able to take basic care of the children, including changing them, playing with them, and feeding them. One of his older children struggled with nutrition, and a hospital told Pierson how to properly feed the child. Moreover, while Pierson does suffer from an intellectual disability, the State presented evidence that his disability is mild: his I.Q. score is three points below the cutoff to be considered impaired. The expert witnesses also opined that Pierson would be capable of basic life tasks, like feeding a child. All of those who interviewed him found his answers to be responsive and coherent, even if basic. Moreover, the jury took account of

Pierson's mental handicap by declining to find him guilty of murder and finding him guilty but mentally ill of the remaining charges.

[16] This case is a tragedy. Even the most able parents struggle to ensure that the needs of their children are met. When a parent is intellectually disabled and struggles with the basics of taking care of himself, let alone his children, it feels less than perfectly just to send him away to prison for failing to do what he may be barely capable of doing. Of course, it would also be unjust to the child-victims of those who neglect their dependents if our justice system made an exception for parents in difficult circumstances, as those children likely require the most protection.

[17] In sum, the question of whether Pierson could understand his surroundings enough to knowingly and voluntarily neglect K.H. is an extremely difficult and fact-sensitive inquiry, which our justice system reserves for a jury. Here, the jury was presented with extensive information regarding Pierson's intellectual disability. Some of this evidence suggests that Pierson was capable of understanding the harm that the failure to feed K.H. was inflicting, and other evidence suggests the opposite. Because the evidence conflicts on this matter, our standard of review forbids us from disturbing the determination of the jury.

## II. The Video Deposition

[18] Indiana Jury Rule 20 mandates trial courts to instruct the jury before opening statements on several matters, one of which is "that jurors, including alternates, may seek to ask questions of the witnesses by submission of questions in

writing." *Accord* Ind. Evidence Rule 614. Pierson cites case law in which we have reversed and remanded convictions where a jury was not permitted to ask questions, even "without a showing by the appellant that he had actually been prejudiced by the erroneous instruction . . . . that prejudice is presumed and a new trial is required." *Dolezal v. Goode*, 433 N.E.2d 828, 834 (Ind. Ct. App. 1982). Pierson argues that the trial court erred by allowing Dr. Davidson's video deposition to be played at trial, since the jury could not ask Dr. Davidson any questions.

[19] We disagree. Indiana Trial Rule 32(A) explicitly permits courts to use portions of a deposition attended by both parties if the parties agree to do so. The parties in this case agreed to its use, as shown by a pre-trial order: "[r]espective counsel further agree that Dr. Davidson need not be subpoenaed and that the use of the videotape deposition of Dr. Davidson will be satisfactory for use at trial." Appellant's App. Vol. 3 p. 3.[7]

[20] Pierson's attorney was present for Dr. Davidson's deposition, and so had an opportunity to cross-examine him. During this recorded cross-examination, Pierson's attorney was able to elicit testimony regarding the extent of Pierson's disability, asking Dr. Davidson about Pierson's limited ability to understand his surroundings or to carry out instructions. To rule that parties cannot agree to use recorded video depositions could harm the rights of defendants who want

---

[7] Not only did the parties agree to the video's admission, the transcript even suggests that Pierson's attorney volunteered to operate the projector. Tr. p. 1129.

the testimony to be admitted—we hesitate to say that the jury's right to ask questions of witnesses could supersede the defendant's right at his own trial to present the evidence he chooses. Accordingly, this argument is unavailing.[8]

## III. Dr. Parker's Testimony

[21] At trial, Dr. Parker testified that the Indiana definition of mental disease and insanity requires "the presence of significantly impaired perception, uh, which I interpret to mean symptoms of psychosis, like hallucinations or delusions . . . ." Tr. p. 1065. In fact, the definition does not require psychosis or hallucinations: "A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." Ind. Code § 35-41-3-6(a). "Mental disease or defect" is defined as "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception . . . ." *Id.* at -6(b).

[22] Pierson acknowledges that trial counsel did not object to this testimony. "Failure to object at trial waives the issue for review unless fundamental error occurred." *Hoagland v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012). "In order to be fundamental, the error must represent a blatant violation of principles

---

[8] While we do not believe that the admission of the video deposition was error, we also note that it would be an invited error of which Pierson cannot take advantage. *Nichols v. State*, 55 N.E.3d 854, 862 (Ind. Ct. App. 2016).

rendering the trial unfair to the defendant and thereby depriving the defendant of due process." *Id.*

[23] Pierson argues that Dr. Parker's testimony was so blatantly prejudicial that the trial court committed fundamental error by allowing it to occur. "By virtue of Dr. Parker being a profession [sic] expert in the area of evaluating sanity under Indiana law, this misinformation undoubtedly discouraged the jury from giving due consideration to the defense of insanity." Appellant's Br. p. 24.

[24] Dr. Parker's statement, by itself, certainly appears to misstate the elements of the insanity defense. We find, however, that the full remarks made by both experts more than adequately informed the jury of the applicable standards. When Pierson cross-examined Dr. Parker, they had the following colloquy:

> PIERSON: Doctor Parker, as you understand the definition of mental disease or defect does it explicitly state in the definition of that term the words that you just used regarding psychosis and hallucinations?
>
> DR. PARKER: Not specifically. It calls for evidence of gross and demonstrable per--, uh disturbance of perception.
>
> PIERSON: And, it does not include in its definition anywhere the word delusional, does it?
>
> DR. PARKER: No, it does not.
>
> PIERSON: That's your interpretation of the words provided in the statute, correct?

DR. PARKER: Yes, Sir.

Tr. p. 1065. Dr. Parker was also asked, "Is mental retardation a mental defect," to which he answered, "That's kind of a hard phrase [] but yeah, that's sort of how I think of it . . . ." *Id.* at 1087. On re-direct, the State read the exact definition of insanity, including both mental disease or defect, but Dr. Parker stuck to his conclusion that Pierson "could have appreciated the wrongfulness of his actions." *Id.* at 1091. A few moments later, he again affirmed the statement, "it is further my opinion with reasonable medical certainty that Defendant could have appreciated the wrongfulness of his behavior at the time of the alleged offense . . . ." *Id.* at 1098. Dr. Parker then explained why he did not use more definitive language: "I wrote he could have appreciated because it's also possible he could not have appreciated. So that reflects a certain amount of uncertainty. . . . I was unable to say that he did appreciate the wrongfulness which is a very clear, declarative statement, and I chose to use could have instead." *Id.* at 1120.

[25] In his video deposition, Dr. Davidson came to very similar conclusions. He also diagnosed Pierson as having a borderline to mild intellectual disability. *Id.* at 1139. He also testified that it was "improbable" that Pierson had a mental disease or defect such that he could not understand the wrongfulness of his actions. *Id.* at 1141-42. He opined that the mild form of intellectual disability that Pierson suffers would not qualify as a mental disease for purposes of the insanity defense. *Id.* at 1167. But like Dr. Parker's testimony, this statement was clarified:

Q.: And, in regard to that as far as your understanding the question for a jury or a trial to the bench by the Court as to whether or not a person is responsible for having engaged in prohibited conduct is that they not only have a mental disease or defect but they are unable to appreciate the wrongfulness of the conduct at the time of the offense, do you understand –

A.: That's my understanding of the statute.

Q.: And, so in this case even though Mr. Pierson is mildly mentally retarded or handicapped, which I think obviously is a better term, you made a finding that or are you saying that he was able to appreciate the wrongfulness of the conduct at the time of the offense in regard to the charges filed?

A.: That's correct, that was my opinion.

*Id.* at 1167-68. In a later cross-examination, Dr. Davidson says that it "is really very difficult" to say whether mild mental retardation would qualify as a mental disease or defect, but he affirmed that he "can't say that . . . it's [his] understanding that mental retardation is not a mental disease or defect as a matter of law." *Id.* at 1194.

[26] In sum, when we look at the remarks of both expert witnesses in their full context, we find that the jury was repeatedly informed of the correct legal standard. On multiple occasions, the experts responded directly to the question of whether Pierson was able to understand the wrongfulness of his conduct, which is the precise definition of insanity for the purposes of Pierson's defense. Moreover, both experts testified that low-level functioning might be able to

qualify under the defense, but they did not believe that Pierson met that standard. Finally, both experts gave very nuanced testimony; they both explained the symptoms of Pierson's disability, informed the jury of their uncertainty regarding Pierson's ability to understand what was happening to K.H., but ultimately concluded (despite their uncertainty) that Pierson likely understood the wrongfulness of his conduct.

[27] Inferring a state of mind is difficult enough for the ordinary defendant, and even more difficult for a defendant who suffers from an intellectual disability. The experts' remarks, taken in their full context, appropriately explained their conclusions in light of the correct legal standard. We find no error in this regard, and we also note that it is primarily the responsibility of the trial court, not expert witnesses, to instruct the jury on the applicable law—Pierson does not argue that the trial court improperly instructed the jury.

[28] The judgment of the trial court is affirmed.

Najam, J., and Altice, J., concur.