FILED

Apr 10 2023, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Mark K. Leeman<br>Leeman Law Office<br>Logansport, Indiana | Theodore E. Rokita<br>Attorney General of Indiana<br>Indianapolis, Indiana |
| | George P. Sherman<br>Supervising Deputy Attorney<br>General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

Rachel W. Baker,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 10, 2023

Court of Appeals Case No.
22A-CR-998

Appeal from the Cass Superior
Court

The Honorable Lisa Swaim, Judge

Trial Court Cause No.
09D02-2102-F5-5

**Opinion by Judge May**
Judges Weissmann and Foley concur.

**May, Judge.**

[1] Rachel W. Baker appeals her conviction of Level 5 felony possession of methamphetamine at a penal facility.[1] She presents three arguments, which we consolidate and restate as:

> 1. Whether the trial court abused its discretion when it admitted into evidence the methamphetamine found on Baker during a search incident to arrest; and
>
> 2. Whether the State presented sufficient evidence Baker was voluntarily in the Cass County Jail as required to elevate her conviction of possession of methamphetamine from a Level 6 felony to a Level 5 felony.

We affirm.

## Facts and Procedural History[2]

[2] At approximately 3:17 a.m. on February 3, 2021, Indiana State Police Trooper Chad Babbs initiated a traffic stop of a "Ford pickup truck, brown or reddish in color," after he observed the driver of the truck was not wearing a seatbelt. (Tr. Vol. II at 64.) The driver, later identified as Luther Baker ("Luther"), provided Trooper Babbs with his license and registration. Luther admitted he was driving without a seatbelt. Luther also told Trooper Babbs "the vehicle was not

---

[1] Ind. Code § 35-48-4-6.1 (possession of methamphetamine); Ind. Code § 35-48-1-16.5(7)(A) (enhancement for possession of illegal substance in a penal facility).

[2] We held oral argument on this case on February 14, 2023, at Indiana State University. We thank counsel for their presentations and David Bolk, his students, and other ISU faculty for their hospitality.

properly registered" because Luther "had purchased [it] approximately two weeks prior." (*Id.* at 66.)

Trooper Babbs observed two women sitting on the bench seat next to Luther. He obtained the VIN number for the vehicle and asked the women for identification. The first woman told Trooper Babbs her name was Taylor Hall and gave her date of birth. The second woman told Trooper Babbs her name was Julie Johnson and provided a date of birth. Trooper Babbs returned to his car to run computer checks on the VIN number and all of the occupants. He found out Hall had a warrant for her arrest, but he was unable to find information on Julie Johnson using the date of birth given to him by the second woman. Trooper Babbs contacted the Cass County Sheriff's Department and spoke with Deputy Jacqueline Beebout, who told him the woman may be Baker. Trooper Babbs entered the information Deputy Beebout gave him about Baker into his computer. The computer search provided a BMV picture of Baker that matched the second woman in the truck. The computer search also indicated there was an active arrest warrant for Baker for a probation violation.

Trooper Babbs spoke again with Deputy Beebout and asked her to come to the scene for back up. Trooper Babbs returned to the truck and explained the seat belt citation to Luther. He then asked Luther, Hall, and Baker to exit the vehicle. When Deputy Beebout arrived on the scene, she searched Hall and Baker. Trooper Babbs arrested Hall and Baker on their outstanding warrants and told them he would be transporting them to the Cass County Jail. Trooper Babbs told Hall and Baker "that if they had anything else on their person going

into the Cass County Jail, that they would catch an additional charge for trafficking." (App. Vol. II at 22.) Both women indicated "they did not have anything on their person." (*Id.*)

[3] Deputy Beebout transported Hall and Baker to the Cass County Jail. When they arrived, there were "posters or signs . . . on the sliding doors inside the garage" indicating that bringing illegal substances or paraphernalia into the jail would result in a Level 5 felony charge. (Tr. Vol. II at 217.) Correctional Officer Kayla Kennedy completed the intake process with Baker. Before she searched Baker, Officer Kennedy asked Baker if she currently possessed any illegal substances. Baker indicated she did not. Officer Kennedy performed a "[p]retty intensive pat down" and discovered a small bag containing what Officer Kennedy suspected to be methamphetamine in Baker's pocket. (*Id.*) Subsequent laboratory testing confirmed the substance was methamphetamine.

[4] Based thereon, on February 3, 2021, the State charged Baker with Level 5 felony possession of methamphetamine at a penal facility. On November 23, 2021, the State charged Baker with the lesser-included offense of Level 6 felony possession of methamphetamine.[3] On December 12, 2021, Baker filed a motion to dismiss the Level 5 felony possession charge because she "was not voluntarily at the Cass County Jail, and her conduct was, therefore, neither knowing or [sic] intentional." (App. Vol. II at 66.) She further asserted that,

---

[3] Ind. Code § 35-48-4-6.1.

"[e]ven if she was aware of the presence of methamphetamine, the Defendant had the right to remain silent, and was not required to incriminate herself by volunteering that there was a baggie of Methamphetamine." (*Id*.)

On December 16, 2021, the trial court held a hearing on Baker's motion to dismiss. Baker argued, in part:

> Knowing or intentional is a, an element of the offense that she's charged with and so the question is at the point that she had the ability to act voluntarily, which was when she put that baggie in her pocket at some point, did she [do so] knowing or intending that that baggie would be in the jail.

(Tr. Vol. II at 42.) Baker also argued requiring her to disclose her possession of the methamphetamine before it was found in her pocket was a violation of her Fifth Amendment right against self-incrimination. The trial court denied the motion to dismiss and stated from the bench:

> I think that there is a real element of public policy and safety concern regarding people who bring items of contraband into a jail facility. A facility where people are being held against their will because they are, they have charges or whatnot or they're serving a sentence and I think there is a, a real, at least in my mind, a real element of concern about making sure that someone doesn't bring drugs into the jail or a knife into the jail or other items into the jail that could pose a danger to those people that are being held in the jail. And I think that that public policy argument is, is paramount in determining whether or not someone's going to be held accountable for bringing items into the jail. I think that's a very important element of this. But I also think that if there's an individual who knows that they're entering a facility, they know that they have drugs on their

person and I think that the law in many instances and in most instances, indicates that if a person is actually carrying an item on their person, whether it be drugs or a weapon, a gun or, you know, whatever, and that it's actually being carried on their person, that they have actual knowledge that it is on their person, then I think the law in most instances will indicate that, that the person if they are carrying something in their clothing or on their person, and they have, that's a pretty good indication that they have knowledge that it is there. And if they are entering a facility with the knowledge that they have some piece of contraband on their person then I think that they're in a situation where they are taking a, a risk of bringing something into a facility that would qualify them for the enhancing circumstance of carrying contraband of some kind into a penal facility that would increase or enhance the possible penalty for a regular possession, whether it be drugs or whatnot. In this case it's drugs. So the fact that you have a person, and in this case, Ms. Baker, who has been arrested and is being taken to the facility and you have a person that is the arresting officer or the receiving officer in the jail in the facility asking this individual if they have any items of contraband or any drugs on their person, that, that they, they could tell them, they could tell the individual that is working there before they step over a threshold that would be considering actually inside the facility, and I think in this case is happens in Sally Port [at the Cass County Jail] or somewhere outside of the Sally Port, they have the opportunity to bring that to light before they are taken into the facility, I see that as opportunity that that arresting officer or receiving officer is giving to the arrested individual to remind them if they have anything that would be considered contraband on their person that it would be better for them to, to produce that prior to walking into the jail. Do they have to produce it? No they do not. They have the choice. They absolutely have the right against self-incrimination. They do not have to, to tell the officer that they in fact have a, a bag of narcotics or a gun on their person or any, a knife, or any other thing that they have on their person. They have no duty to tell the officer. But the officer is giving them, I believe, an

opportunity to bring that fact to light before they step over the threshold of the jail and the, I think the officer is telling them that for two reasons. Number one, for the safety and security of the jail and, number two, because they're letting them know that there is this enhancing circumstance that it will be worse if you don't tell us and we find these, some, some item on you when you step over the threshold. The, there is an enhancing circumstance, and it will mean that you would be facing a potential higher penalty and I find that to be a, a piece of very helpful information to an individual just in case they don't know that part of the law. I think that the receiving individual or the arresting individual is doing, is telling them this for two reasons. Number one, keep the jail safe and secure. Number two, don't charge someone with some, with, with the enhancing circumstance if you can save them that, that trouble if they would like to be forthcoming in regard to, or if they would like to, maybe even suggest that the officer search them again. I suppose there's even that possibility that the person might say, "I don't want to incriminate myself, but you, you could search me again, officer, if, you know, just to make sure I don't have any kind of, any other contraband on my person." There, there would be some possibility to, to indicate that they should search a second time just to make sure for everyone's wellbeing. In this case Ms. Baker did not have to admit that she had contraband on her and according to the Probable Cause in the case she, she may not have done so and, and then later when items were allegedly found on her person, they did result in a, in an enhanced charge. Because of that I am going to deny the defendant's Motion to Dismiss Count 1 [Level 5 felony possession of methamphetamine in a penal facility] in this matter. We do have – just a moment. I don't believe, also I don't believe that the enhancing circumstance would only come into play if an individual was brought or if an individual walks into the jail or their own free will. I think that that enhancing circumstance should still apply to any individual that enters the jail. I believe that, and that was kind of a, a second issue in regard to this because the defendant was brought into the jail against her will because she was in fact

being arrested for an alleged offense. But I don't believe that the enhancing circumstance in this case should be relegated to only those individuals who are entering the jail of, not under arrest because the purpose, I believe, of the enhancing circumstance is to maintain the safety and integrity and the security of the jail and I don't believe that this, the fact that she was under arrest would change my opinion of this, of this request[.]

(*Id*. at 46-8) (errors in original).

[6] On February 13, 2022, Baker filed a motion to suppress the methamphetamine seized from her pocket at the jail. The trial court held a hearing on the motion on February 18, 2021. Baker argued, based on the Indiana Seatbelt Enforcement Act ("the ISEA"),[4] that Trooper Babbs was not authorized to ask Baker to identify herself during the traffic stop. Therefore, she contended, the methamphetamine found during the subsequent search at the Cass County Jail should be suppressed. The trial court denied Baker's motion to suppress.

[7] On February 23, 2022, the trial court held a jury trial in the case. During trial Baker objected to the admission of the methamphetamine found in her pocket, and the trial court overruled that objection. The jury returned a guilty verdict on both charges against Baker. The trial court entered a conviction of only the Level 5 felony to avoid double jeopardy concerns and imposed a four-year

---

[4] Ind. Code § 9-19-10-3.1(a).

sentence, with two years to be served in community corrections if Baker qualified and was accepted into that placement.

# Discussion and Decision

## 1. Admission of Evidence

[8] Baker argues she was not required to identify herself under the ISEA and, thus, the trial court abused its discretion when it admitted the methamphetamine found in her pocket during a subsequent search. Our standard of review following admission of evidence after the denial of a motion to suppress is well-settled:

> When ruling on the admission of evidence at trial following denial of a motion to suppress, a trial court must consider the foundational evidence presented at trial. It also considers evidence from the suppression hearing that is favorable to the defendant only to the extent it is uncontradicted at trial. A trial court is in the best position to weigh the evidence and assess witness credibility, and we review its rulings on admissibility for an abuse of discretion and reverse only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. However, the ultimate determination of the constitutionality of a search or seizure is a question of law that we review de novo.

*Gerth v. State*, 51 N.E.3d 368, 372 (Ind. Ct. App. 2016) (internal citations and quotation marks omitted) (cleaned up).

[9] The ISEA states, in relevant part, "a vehicle may be stopped to determine compliance with this chapter. However, a vehicle, the contents of a vehicle, the

driver of a vehicle, or a passenger in a vehicle may not be inspected, searched, or detained solely because of a violation of this chapter." Ind. Code § 9-19-10-3.1(a). Law enforcement officers can initiate a traffic stop pursuant to the ISEA "only where they [have] reasonable suspicion that a seat belt violation [has] occurred." *State v. Richardson*, 927 N.E.2d 379, 382 (Ind. 2010). The plain language of the statute requires "'that when a stop to determine seat belt compliance is made, the police are strictly prohibited from determining anything else, even if other law would permit.'" *Id*. (quoting *Baldwin v. Reagan*, 715 N.E.2d 332, 339 (Ind. 1999)). However, we have held,

> when circumstances arise after the initial stop that create reasonable suspicion of other crimes, further reasonable inspection, search, or detention is no longer "solely" because of a seatbelt violation and does not contravene the plain language of the statute. The officer may only expand his or her investigation subsequent to the stop if other circumstances arise after the stop, which independently provide the officer with reasonable suspicion of other crimes.

*State v. Morris*, 732 N.E.2d 224, 228 (Ind. Ct. App. 2000).

[10] Baker argues "when Trooper Babbs approached the vehicle, there was no indication of any criminal activity inside the vehicle beyond the seatbelt violation." (Br. of Appellant at 23) (emphasis in original omitted). She further asserts:

> There was no furtive movement by the driver or his passengers, no concerns about weapons and bulges, or even nervous behavior by anyone. And the women's responses to Trooper Babbs's

> questioning did not raise any independent reasonable suspicion of criminal activity. There was no reason to question, inspect, detain, or search the passengers.

(*Id*.) Thus, she contends, Trooper Babbs's search of the vehicle violated the ISEA. However, we disagree with Baker based on the holdings of *Trigg v. State*, 725 N.E.2d 446 (Ind. Ct. App. 2000), and *Richardson*.

[11] In *Trigg*, a panel of this Court held an officer, Detective Stone, had reasonable suspicion to investigate further after initiating a traffic stop based on an alleged violation of the ISEA. 725 N.E.2d at 449. In that case, Detective Stone initiated a traffic stop of a vehicle in which Trigg was riding after observing Trigg and the other occupants of the vehicle not wearing their seatbelts. *Id*. at 448. Upon approaching the passenger side of the vehicle, where Trigg was sitting, Detective Stone noted "Trigg appeared nervous and [was] 'fidgeting down in his seat as if he may be attempting to hide something[.]'" *Id*. (citation to the record omitted). Detective Stone testified he feared Trigg was hiding a weapon and asked Trigg to exit the vehicle. *Id*. When Trigg exited, Detective Stone observed a "pipe used to smoke crack cocaine, lying on the seat of the car where Trigg had been sitting." *Id*. Based thereon, Detective Stone searched the passenger area of the vehicle and found another crack pipe. *Id*. The State

subsequently charged Trigg with Class D felony possession of paraphernalia.[5] *Id*.

[12] Prior to his trial, Trigg filed a motion to suppress the crack pipes, which the trial court denied. *Id*. On appeal, Trigg argued the "police may not initiate a traffic stop to determine if the occupants are wearing seatbelts and, thus, evidence obtained as a result of such a stop must be suppressed." *Id*. Our court rejected that argument based on the ISEA.[6] *Id*. Noting waiver of any argument regarding "the validity of the subsequent searches" as part of the traffic stop, our court addressed the issue waiver notwithstanding in an effort to clarify the ISEA:

> A limited search for weapons after an investigative stop is not a search "solely because of a violation" of the seatbelt law. Rather, such a search is the result of actions or behavior on the part of the defendant after the initial stop that lead a police officer to fear for his safety. For this reason, a limited search for weapons does not raise concerns about pretextual stops, where police stop motorists under the guise of enforcing seatbelt laws when the police are actually seeking to search and detain motorists for other reasons. The impetus for a limited weapons search arises after the stop has been made, and the purpose for the search "is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear for his safety or the safety of others." *State v. Joe*, 693 N.E.2d 573, 575 (Ind. Ct. App. 1998), *trans. denied*. Thus, [the earlier version of Indiana Code section 9-19-10-

---

[5] Ind. Code § 35-48-4-8.3 (1998).

[6] *Trigg* examined a previous version of the ISEA. The language in the current statute relevant to the issues before us is almost identical to the earlier version.

3.1] cannot reasonably be interpreted to prohibit police officers from conducting limited weapons searches to ensure their safety so long as circumstances exist over and above the seatbelt violation itself.

*Id*. at 448-9. Because Detective Stone testified he believed Trigg possessed a weapon, we then considered whether the search was reasonable:

Once a vehicle has been properly stopped for investigative purposes, an officer may conduct a search for weapons without obtaining a search warrant if the officer reasonably believes that he or others may be in danger. [*State v. Joe*, 693 N.E.2d 573, 575 (Ind. Ct. App. 1998), *trans. denied*.] The test for determining the reasonableness of the search as enunciated in *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1879-81, 20 L.Ed.2d 889 (1968), is whether the facts available to the officer at the moment of the search would warrant a person of reasonable caution in believing that the action taken was appropriate. *Joe*, 693 N.E.2d at 575. An officer may only conduct a limited search for weapons when he has a reasonable belief that the suspect is armed and dangerous. *Id*. The police officer need not be absolutely certain that the individual is armed. *Id*. In determining whether the police officer acted reasonably under the circumstances, due weight must be given, not to the officer's inchoate and unparticularized suspicions, but to the specific reasonable inferences that the officer is entitled to draw from the facts in light of his experience. *Id*.

*Id*. at 449. Our court held that, because Detective Stone reasonably believed Trigg possessed a weapon, he could ask Trigg to exit the vehicle. *Id*. Then, because the crack pipe was located in plain sight in Trigg's seat, Detective Stone could seize it under the plain view doctrine. *Id*. We therefore concluded the

trial court did not abuse its discretion when it denied Trigg's motion to suppress the crack pipes. *Id.*

[13] Conversely, in *Richardson*, our Indiana Supreme Court held Officer Tanya Eastwood did not have reasonable suspicion to investigate further after initiating a traffic stop based on an alleged seatbelt violation. 927 N.E.2d at 384. Officer Eastwood initiated a traffic stop of Richardson's car after she noticed Richardson was not wearing a seatbelt. *Id.* at 381. Richardson was cooperative with Officer Eastwood and admitted he had not been wearing his seatbelt. *Id.* Officer Eastwood noticed "a very large, unusual bulge" in Richardson's pocket. *Id.* Officer Eastwood asked Richardson what was in his pocket, and Richardson told her it was his handgun. *Id.*

[14] Officer Eastwood requested Richardson's handgun permit and asked him to exit the vehicle. *Id.* Richardson complied, and Officer Eastwood performed a background check on Richardson after she noticed the expiration date on the handgun license was illegible. *Id.* Officer Eastwood discovered Richardson had prior convictions of possession of cocaine and public intoxication but the sentence for the conviction of possession of cocaine made her question whether it was truly a conviction. *Id.* Officer Eastwood did not investigate the matter further and arrested Richardson for "having a firearm with a prior felony conviction within the last fifteen years." *Id.* (citation to the record omitted). Richardson resisted arrest but was eventually subdued. *Id.* at 382. The bulge in Richardson's pocket was later determined to be cocaine he had stashed in his underwear. *Id.*

Richardson filed a motion to suppress the evidence seized in connection with the seat belt violation. *Id*. The trial court granted Richardson's motion to suppress, and the State appealed. *Id*. On appeal, the State contended Officer Eastwood's inquiry regarding the bulge in Richardson's pants was proper based on our Indiana Supreme Court's earlier opinion in *Washington v. State*, 898 N.E.2d 1200, 1207-8 (Ind. 2008), which held law enforcement's inquiry regarding whether a motorist has a weapon during a traffic stop did not violate that motorist's rights against unreasonable search and seizure under Article I, Section 11 of the Indiana Constitution. *Richardson*, 927 N.E.2d at 383. The *Richardson* Court determined *Washington* did not control because *Washington* had not involved a seat belt stop. *Id*.

The *Richardson* court discussed *Trigg*, noting *Trigg* held "[a]n officer may conduct a limited search of inquiry concerning weapons without obtaining a search warrant if the officer reasonably believes that he or others are in danger." *Id*. at 383-4. Our Indiana Supreme Court stated, based on *Baldwin*, that the ISEA "simply does not permit investigatory behavior based solely on a seat belt violation unless circumstances arise after the stop that independently provide the officer with reasonable suspicion of other crimes." *Id*. at 383. "Reasonable suspicion exists where the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an *ordinarily prudent person* to believe that criminal activity has or is about to occur." *Id*. at 384 (quoting *Baldwin*, 715 N.E.2d at 337) (emphasis added in *Richardson*). Ultimately our Indiana Supreme Court held:

While Officer Eastwood did observe an "unusual bulge," this fact standing alone did not provide the independent basis of reasonable suspicion that *Baldwin* requires, especially in light of Richardson's immediate compliance and Officer Eastwood's prior peaceful exchanges with Richardson. On these facts, we agree with the trial court that Officer Eastwood's questioning about the "unusual bulge" contravened the [Indiana Seatbelt Enforcement] Act.

*Id*. at 384 (internal citation omitted).

[17] The facts here are similar to those in *Trigg* and do not cross the limit set by *Richardson*. In the case before us, Trooper Babbs testified Luther was cooperative when Trooper Babbs approached the car and asked for Luther's identification, Luther admitted he was not wearing his seatbelt, Luther did not seem to be under the influence of drugs or alcohol, and there was no indication of criminal activity inside the vehicle "on first approach." (Tr. Vol. II at 191.) However, Trooper Babbs also testified Luther told him "the vehicle was not properly registered. It was something that he had purchased approximately two weeks prior." (*Id*. at 66.)

[18] Indiana law requires a vehicle owner to register a vehicle on the "date the vehicle is acquired[.]" Ind. Code § 9-18.1-11-4. The Code provides a few exceptions to the immediate registration requirement, allowing a person to operate an unregistered vehicle on the highway for the length of a temporary permit or forty-five days after the person acquires a vehicle provided the license plate on the vehicle indicates the person owns the vehicle on which the unexpired license plates are affixed. Ind. Code § 9-18.1-2-8. Pursuant to

Indiana Code section 9-18.1-11-2(c), a person who owns or operates an unregistered vehicle that is required to be registered commits a Class C infraction. Thus, Trooper Babbs had reasonable suspicion to believe Luther committed a Class C infraction based on Luther's statement that the vehicle was not properly registered.[7]

[19]     Infractions are civil and not criminal, *Byrd v. State*, 6 N.E.3d 464, 466 (Ind. Ct. App. 2014). However, "repetitive violations [of traffic law] can result in long term civil and potentially criminal consequences." *Id.* Further, we have upheld multiple auto theft convictions based in part on a vehicle's lack of proper registration. *See, e.g., Muse v. State*, 419 N.E.2d 1302 (Ind. 1981) (lack of proper registration supported conviction of Class D felony auto theft); *Donovan v. State*, 937 N.E.2d 1223, 1224 (Ind. Ct. App. 2010) (lack of proper registration supported conviction of Class D auto theft), *trans. denied*. We have also held lack of proper registration creates reasonable suspicion a vehicle is stolen. *See Browder v. State*, 77 N.E.3d 1209, 1216 (Ind. Ct. App. 2017) (the fact that the registration in the vehicle did not match the vehicle and did not have Browder's name on it gave officer reasonable suspicion that the vehicle was stolen), *trans. denied*.

---

[7] Baker asserts the State has waived any argument regarding Luther's possible violation of Ind. Code § 9-18.1-2-8 because the State did not make that argument during trial. *See Leatherman v. State*, 101 N.E.3d 879, 885 (Ind. Ct. App. 2018) (party cannot assert an argument for the first time on appeal). However, we exercise our discretion to consider the issue waiver notwithstanding. *See Sharp v. State*, 42 N.E.3d 512, 515 (Ind. 2015) (appellate court has discretion to consider issues waived by a party).

[20] Like the officer in *Trigg*, Trooper Babbs had information to suggest criminal activity was afoot – specifically, a registration that did not match the vehicle. While Trooper Babbs would have violated the ISEA if he asked for the registration without reasonable suspicion, *see Richardson*, 927 N.E.2d at 383, Luther's comment that he purchased the vehicle two weeks prior and had not properly registered the vehicle gave Officer Babbs reasonable suspicion to investigate whether Luther may have committed auto theft or a related crime. *See, e.g.*, *Browder*, 77 N.E.3d at 1216. Therefore, Officer Babbs's request that Luther's passengers, including Baker, provide identifying information did not run afoul of the restrictions on investigation set forth in the ISEA.[8] *See, e.g., Morris*, 732 N.E.2d at 228 (officer can extend stop for alleged violation of the ISEA if he has a reasonable suspicion criminal activity is afoot).

[21] Baker's argument for a contrary finding is premised on a faulty interpretation of Trooper Babbs's testimony on cross-examination at the suppression hearing and at trial. At the hearing, Trooper Babbs testified:

> [Baker]:    You mentioned that the, you noted that the license plate on the vehicle returned to a different vehicle. Is that correct?
>
> [Babbs]:    It was definitely a different color.

---

[8] Given the narrow application of the ISEA, Baker seems to be seeking a blanket prohibition against obtaining seatbelt-wearing passengers' identification absent independent reasonable suspicion or probable cause. Though we can find no Indiana cases addressing whether an officer may request passenger identification in this scenario, this is not the case presented to us. Here, the officer had a legitimate reason to further investigate given the inconsistent vehicle registration.

[Baker]:      Different color?

[Babbs]:      Yes.

[Baker]:      And, and did, Trooper, did the driver make some statement to you about the manner in which he'd acquired the vehicle that it was on at that point?

[Babbs]:      I don't recall that, he just recently got it two weeks prior to the traffic stop.

[Baker]:      That was what I was getting to.

[Babbs]:      Yes. Yes.

[Baker]:      So, he had said he'd purchases, purchased it two weeks ahead?

[Babbs]:      That's correct.

[Baker]:      And you, you testified you're familiar with traffic law generally, is that correct?

[Babbs]:      Yes.

[Baker]:      And you're aware that when you trade in a vehicle or, or get a newly acquired vehicle that you have 45 days that you can still use the license plate from the prior vehicle. Is that correct?

[Babbs]:      Correct.

[Baker]:      Okay. And you didn't cite him for false and fictitious registration or anything like that?

[Babbs]:      I did not.

[Baker]:      Okay. At that point did you have any indication of any criminal activity inside the cab of the vehicle?

[Babbs]:      No. Just the infraction on Mr. Baker.

(Tr. Vol. II at 73-4.) Trooper Babbs testified at trial that he lacked any reasonable suspicion of criminal activity "inside the vehicle." (*Id.* at 191.)

[22] Baker views Trooper Babbs's testimony as indicating that he lacked reasonable suspicion of *any* criminal activity before asking for her identification. But Trooper Babbs's testimony is more aptly construed as statements that he had no reasonable suspicion that the three occupants were actively engaging in criminal activity within the truck (such as drug possession or use) when he requested Baker's identification.

[23] Trooper Babb already had obtained the VIN number with the intent to run the check of the vehicle, whose plate belonged to another vehicle. Obtaining the VIN number and running the computer check on it would have served no purpose absent Trooper Babbs's reasonable suspicion about potential criminal activity associated with the registration. As the State notes, "An officer is not required to accept at face value a motorist's claim about how he came into possession of a vehicle for which he does not have proper registration." (Br. of Appellee at 12.) *See also State v. Bouye*, 118 N.E.3d 22, 25 (Ind. Ct. App. 2019) (officer had "an objective, reasonable suspicion that Bouye had violated a traffic law or ordinance" when the vehicle had an incorrect license plate); *Smith v. State*, 713 N.E.2d 338, 342 (Ind. Ct. App. 1999) (ruling that when a license plate check reveals a mismatched plate, the officer has reasonable suspicion to believe theft has occurred), *trans. denied.* Therefore, given our reading of the record and the holdings of *Trigg* and *Richardson*, we disagree with Baker that Trooper Babbs' request for Baker's identification was improper under the ISEA.

[24] As this is the only basis on which Baker challenges the trial court's admission of the methamphetamine, we conclude it did not abuse its discretion when it admitted into evidence the methamphetamine found on Baker during Officer Kennedy's search at the Cass County Jail.

## 2. Sufficiency of the Evidence

[25] Baker also argues the State did not prove she committed Level 5 felony possession of methamphetamine in a penal facility because the State did not present evidence she was in the Cass County Jail voluntarily. It is well-settled that claims of insufficient evidence

> warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility. Rather, we consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt.

*Powell v. State*, 151 N.E.3d 256, 262-63 (Ind. 2020) (internal citations omitted).

[26] Indiana Code section 35-48-4-6.1 states, in relevant part:

> (a) A person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine (pure or adulterated) commits possession of methamphetamine, a Level 6 felony, except as provided in subsections (b) through (d).
>
> (b) The offense is a Level 5 felony if:

> (1) the amount of the drug involved is at least five (5) but less than ten (10) grams; or

> (2) the amount of the drug involved is less than five (5) grams and an enhancing circumstance applies.

An "enhancing circumstance" occurs when, among other things, the person commits the relevant offense while on penal facility property. Ind. Code § 35-48-1-16.5(7)(A).

[27] Baker contends the State did not prove she was in the Cass County jail voluntarily. Indiana Code section 35-41-2-1 states, in relevant part:

> (a) A person commits an offense only if he voluntarily engages in conduct in violation of the statute defining the offense.

> \* \* \* \* \*

> (b) If possession of property constitutes any part of the prohibited conduct, it is a defense that the person who possessed the property was not aware of his possession for a time sufficient for him to have terminated his possession.

"The voluntary act statute codified the axiom that voluntariness is a 'general element of criminal behavior' and reflected the premise that criminal responsibility 'postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.'" *McClain v. State*, 678 N.E.2d 104, 107 (Ind. 1997) (quoting Ind. Crim. Law Study Comm'n, Indiana Penal Code Proposed Final Draft 11 (1974)). "Once evidence in the record

raises the issue of voluntariness, the State must prove beyond a reasonable doubt that the defendant acted voluntarily. If the State fails to prove that a defendant's conduct was voluntary, it has not proved every element of the offense." *O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012) (internal citations omitted).

[28] Baker asserts the issue of voluntariness is relevant here because "she did not choose to possess methamphetamine at the penal facility[;]" instead, when Trooper Babbs discovered there was a warrant for Baker's arrest, she was "immediately handcuffed" and was "no longer free to go." (Br. of Appellant at 29) (quoting Tr. Vol. II at 194-5). Further, Baker argues, "Trooper Babbs's custodial statements to [Baker] did not render her possession of methamphetamine at the jail a voluntary act." (*Id*. at 30.) Trooper Babbs testified that, when he arrested Baker, he told her "if [she] had anything else on [her] person going into the Cass County Jail that [she] would catch an additional charge for trafficking." (Tr. Vol. II at 76-7.) Baker contends she had two choices: "confessing to possessing methamphetamine or being charged with trafficking" and "[a]ny alleged choice that [she] had was illusory." (Br. of Appellant at 30.)

[29] Baker also argues the posters or signs outside the jail intake area indicating possession of illegal substances inside the jail would enhance the offense did not render her conduct voluntary because "[a]t the time that [she] could have read the signs she was already inside the jail garage" and "the record shows that officers pulled [Baker] from Deputy Beebout's car and led her in handcuffs

directly past the signs and into the custody of [a] correction officer inside the jail." (Br. of Appellant at 30) (citing Tr. Vol. II at 216-7). Baker contends that, should we determine she voluntarily entered the Cass County Jail while possessing methamphetamine, such a holding "creates an illogical incentive for officers not to conduct searches at arrest but to search suspects at the jail to arbitrarily make defendants eligible for a higher-level felony." (*Id.*)

[30] Indiana appellate courts have considered voluntariness in other situations. *See, e.g., Schlatter v. State*, 891 N.E.2d 1139, 1143 (Ind. Ct. App. 2008) (rejecting argument Schlatter did not voluntarily commit Class B felony sexual misconduct with a minor because Schlatter was intoxicated at the time of the crime), and *Pierson v. State*, 73 N.E.3d 737, 741 (Ind. Ct. App. 2017) (rejecting Pierson's claim that he did not voluntarily commit Class A felony neglect of a dependent causing death because his mental disability prevented him from maintaining the standard of care of a reasonable parent), *trans. denied*. However, Indiana appellate courts have not considered this particular issue, that is, whether a person who possesses an illegal drug and is subsequently transported to a penal facility is in the penal facility voluntarily as to support a conviction of possession of the illegal drug in the penal facility. Thus, this is an issue of first impression in Indiana.

[31] Because this is an issue of first impression, "decisions from other jurisdictions can be instructive." *Church v. State*, 189 N.E.3d 580, 587 (Ind. 2022). The facts in *Herron v. Commonwealth*, 688 S.E.2d 901 (Va. Ct. App. 2010), are virtually identical to those in the case before us. In *Herron*, police arrested Herron

following an incident at an apartment complex. *Id*. at 902. During a search incident to arrest, the officer asked Herron "if he had anything in his buttocks or crotch area." *Id*. at 903. The officer was unable to complete the search because when the officer "touched the backside of [Herron's] legs, [Herron] immediately spun around." *Id*.

[32] The officer transported Herron to jail. The officer asked Herron "if he had any contraband on his person" and told Herron "there were additional charges for taking any illegal substance inside the jail." *Id*. Herron indicated he "did not have any drugs." *Id*. Upon arrival at the jail, the officer told deputies at the jail that Herron was uncooperative during the search incident to arrest and would need to be searched further. *Id*. After performing a pat down search and a strip search, deputies found "a plastic baggy between [Herron's] buttocks." *Id*. Herron "pulled the bag from his buttocks, ripped it open, and began shoving small packets of an off-white substance into his mouth." *Id*. The substance was later determined to be cocaine. *Id*.

[33] The Commonwealth of Virginia alleged Herron violated Va. Code § 53.1-203(5), which states, in relevant part, "[i]t shall be unlawful for a prisoner in a state, local or community correctional facility or in the custody of an employee thereof to . . . 5. Procure, sell, secret or have in his possession any chemical compound which he has not lawfully received." During his trial, Herron moved to strike the evidence recovered during the search at the jail. *Herron*, 688 S.E.2d at 903. He argued "he did not have the requisite intent to bring cocaine into the jail and that forcing him to confess to possession of the drugs violated

his Fifth Amendment right against self-incrimination." *Id*. The trial court denied Herron's motion to strike and found Herron guilty as charged. *Id*.

[34] On appeal, Herron argued the Commonwealth did not present sufficient evidence to support his conviction because, in part, the Commonwealth did not prove he took the cocaine into the jail voluntarily. *Id*. at 699. Noting the issue was one of first impression in Virginia, the court cited cases that followed the majority view of the issue - that knowingly possessing an illegal substance is sufficient to prove voluntary possession of that substance in a penal facility:

> [T]he majority of other jurisdictions find "no more than entry into jail knowing that one is carrying contraband is required by the plain terms of the governing statutes." *See State v. Alvarado*, 219 Ariz. 540, 200 P.3d 1037, 1041, 1043 (Ariz. Ct. App. 2008) ("[Defendant's] possession of a controlled substance was voluntary in that, after being advised of the consequences of bringing drugs into the jail, [the defendant] consciously chose to ignore the officers' warnings, choosing instead to enter the jail in possession of cocaine."); *People v. Ross*, 162 Cal. App. 4th 1184, 76 Cal.Rptr.3d 477, 479-82 (2008) (finding voluntary act does not require the defendant's presence in jail be voluntary as that would controvert settled public policy); *State v. Winsor*, 110 S.W.3d 882, 886-88 (Mo. Ct. App. 2003) (affirming the defendant's conviction for possessing a controlled substance in jail, reasoning that voluntary presence in jail was not an element of the offense, and to hold otherwise would lead to an absurd result); *Brown v. State*, 89 S.W.3d 630, 633 (Tex. Crim. App. 2002) (en banc ) (rejecting the defendant's claim that he did not voluntarily bring marijuana into jail, the court reasoned that under Texas law, the term "'voluntarily'" means simply the "'absence of an accidental act, omission or possession'" (quoting *Alford v. State*, 866 S.W.2d 619, 624 (Tex. Crim. App. 1993))); *State v. Canas*, 597 N.W.2d 488, 496-97 (Iowa 1999) (rejecting the

defendant's claim that he did not voluntarily bring marijuana into jail, the court reasoned that the defendant had the option of disclosing the drugs before he entered the jail and chose not to do so), *abrogated in part on other grounds, State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001).

*Id*. at 699-700.

[35] The court in *Herron* also cited cases supporting the minority view - that while a person voluntarily possessed an illegal drug outside of jail, being involuntarily taken into a jail renders improper a finding that the person voluntarily possessed the illegal drug inside the jail.

> Courts in the minority of jurisdictions hold that in order for the involuntary act of entering the jail with drugs to supply the basis for a conviction of bringing drugs into jail, "the involuntary act must, at a minimum, be a reasonably foreseeable or likely consequence of the voluntary act on which the state seeks to base criminal liability." *State v. Tippetts*, 180 Or. App. 350, 43 P.3d 455, 459-60 (2002) ("[Police officer's] act of arresting [the] defendant and transporting him to jail was an intervening cause [that alleviated the] defendant's criminal liability."). *Accord State v. Eaton*, 143 Wash. App. 155, 177 P.3d 157, 161-62 (2008). *See also State v. Cole*, 142 N.M. 325, 164 P.3d 1024, 1026-27 (N.M. Ct. App. 2007) (finding the defendant must enter the jail voluntarily in order to be convicted under the statute); *State v. Sowry*, 155 Ohio App. 3d 742, 803 N.E.2d 867, 870-71 (2004) (holding the defendant could not be held liable for conveying drugs into the detention facility because he had no control over his person once he was arrested).

*Id*. at 700.

[36] Based thereon, the *Herron* court decided to follow the majority view, "because these opinions are generally more logically related to the language of our statute and Virginia case law and because these opinions more accurately reflect the intent of our legislature in creating Code § 53.1-203(5)." *Id*. at 700-1. It held:

> Any analysis of Code § 53.1-203(5) directing the focus to the "voluntariness" of appellant's entry into the correctional facility would lead to absurd results because it can be reasonably assumed that virtually no one goes to jail voluntarily. Accordingly, we hold appellant's criminal action in this case was failing to dispose and/or reveal the presence of the drugs on his person prior to his transport into the jail facility. Appellant had ample opportunity to reveal the concealed drugs before he was taken inside the jail. The evidence at trial showed that appellant was inside an apartment for ten to fifteen seconds before Officer Thomas entered. Further, after appellant was arrested, [Officer] Thomas asked appellant if he had any drugs on his person, to which appellant responded that he did not. Before entering the jail, [Officer] Thomas again asked appellant if he had any drugs on his person and advised appellant that there were additional charges for bringing contraband into the jail. However, appellant chose to conceal drugs on his person and then failed to disclose the drugs after being advised of the consequences of bringing drugs into the jail. Under these circumstances, we hold appellant's act of taking drugs into the jail was voluntary.

*Id*. at 701.

[37] The *Herron* court's analysis is applicable here. Virginia's statute governing the possession of illegal drugs in a penal facility is similar to Indiana's possession statute and related enhancement. *Compare* VA Code § 53.1-203(5) (it is unlawful for a person to be in jail while possessing an illegal substance) *and* Ind.

Code §§ 35-48-4-6.1 and 35-48-1-16.5(7)(A) (Level 6 felony possession of methamphetamine is enhanced to a Level 5 felony when the methamphetamine is possessed while in a penal facility). While we cannot know what our Indiana legislature's exact intent was when enacting the enhancement statute, we presume "the General Assembly does not intend unreasonable or absurd results." *Smith v. State*, 194 NE.3d 118, 127 (Ind. Ct. App. 2022). We acknowledge someone is not voluntarily visiting the jail after being arrested. However, like the defendant in *Herron*, Baker was arrested for a reason unrelated to her possession of methamphetamine and informed any felony possession of an illegal substance would be enhanced if she possessed it in the Cass County Jail. Baker chose to ignore that warning.[9] Based on *Herron*, and the majority of cases outside Indiana, we conclude the State presented sufficient evidence Baker knowingly or intentionally committed Level 5 felony possession of methamphetamine in a penal facility because she voluntarily possessed methamphetamine inside the Cass County Jail.

# Conclusion

---

[9] Baker also argues she was entrapped by police. However, "[e]ntrapment exists where an otherwise law-abiding citizen is induced through police involvement to commit the charged crime." *Lahr v. State*, 640 N.E.2d 756, 760 (Ind. Ct. App. 1994), *trans. denied*. Baker ceased being a law-abiding citizen as soon as she knowingly and intentionally placed the methamphetamine in her pocket. *See* Ind. Code § 35-48-4-6.1(a) ("A person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine (pure or adulterated) commits possession of methamphetamine, a Level 6 felony."). Moreover, Trooper Babbs's warning was an attempt to discourage Baker from committing the enhanced crime, which negates any possible inference that he was "induc[ing]" her to commit the enhanced crime. *Lahr*, 640 N.E.2d at 760. Thus, Baker cannot successfully assert an entrapment defense.

[38] Luther's admission that the vehicle he was driving was not properly registered gave Trooper Babbs reasonable suspicion of criminal activity to allow him to inquire about the identities of Luther's passengers, including Baker. Therefore, the trial court did not abuse its discretion when it admitted the methamphetamine found on Baker. Additionally, Baker voluntarily committed Level 5 felony possession of methamphetamine in a penal facility when she chose not to heed Trooper Babbs's warning that any felony related to possession of any illegal substances would be enhanced when she took those substances into a penal facility. Accordingly, we affirm.

[39] Affirmed.

Weissmann, J., and Foley, J., concur.